NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0352n.06

No. 22-6090

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 02, 2023
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff – Appellee, | ) ) | ON APPEAL FROM THE |
| v. | ) ) | UNITED STATES DISTRICT COURT FOR THE WESTERN |
| | ) | DISTRICT OF TENNESSEE |
| DONALD RAY HARRIS, JR., | ) ) | |
| Defendant – Appellant. | ) | OPINION |
| | ) | |

Before: MOORE, GIBBONS, and BUSH, Circuit Judges.

**JOHN K. BUSH, Circuit Judge.** This case arises from a revocation of supervised release and a resulting term of 24 months in prison. Harris asserts that the district court erred in finding that Harris violated a condition of his supervised release by participating in a robbery and challenges the evidence relied upon. Seeing no abuse of discretion, we AFFIRM.

I.

On May 31, 2018, a federal grand jury returned a superseding indictment charging Harris with being a felon in possession of ammunition, being a felon in possession of a firearm, and attempting to tamper with a witness. On July 17, 2018, Harris, in exchange for dismissal of the other counts, pleaded guilty to one count of being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1). The district court sentenced him to 27 months in prison followed by two years of supervised release.

Harris's supervised release began on March 14, 2020. His probation officer petitioned the court for a revocation on August 8, 2021 on the grounds of new allegations of aggravated assault, possession of marijuana, and (as amended) resisting a stop-and-frisk. The court sentenced Harris to time served and imposed a one-year term of supervised release, to expire on March 25, 2023.[1]

On May 20, 2022, the probation officer again petitioned the court for revocation, alleging that Harris committed first-degree murder during an aggravated robbery and conspiracy to commit aggravated robbery. According to an affidavit from officers, the victim was found at his home with possible gunshot wounds. Using surveillance footage, detectives developed four suspects. Two of the suspects confirmed Harris's presence at the scene and described a gunfight that led to the victim's death. Detectives obtained a warrant for the suspects' phones and allegedly confirmed their plans for the robbery. The probation officer also noted the allegation that Harris communicated with three people to conduct a robbery and homicide, suggesting he was communicating with people known to be engaged in criminal activity—which also would be a violation of his supervised release.

On November 30, 2022 and December 5, 2022, the district court conducted a supervised release revocation hearing. The main witness was Detective Hunter Black. He spoke to eyewitnesses in the area who provided a tip about the vehicle that was used in the commission of the offense. Black used surveillance footage from neighborhood cameras to visualize the SUV, track its movements, and determine three individuals were inside. The footage revealed the SUV driving by the victim's residence an hour and a half before the shooting, as well as arriving at the residence and parking at the time of the incident. Black also obtained footage from a nearby gas

---

[1] The order states that the term of supervised release expires on March 25, 2022, the same day the order was filed, and so the judge must have intended to write March 25, 2023.

station which revealed a rendezvous of the co-conspirators before the crime. Examination of store receipts at the gas station identified defendant Jeremiah Chalmers. Defendants Jarrod Vaughn and Phillip Jones were identified through Facebook friend searches using Chalmers's profile. Search warrants of their homes corroborated these identifications; all three men were taken into custody on May 12, 2022.

Black testified that Chalmers, presented with a photograph lineup, identified Harris by a nickname, "Ball Cap," because Harris was the only one wearing a cap that day and Chalmers did not know him personally. Further, Black explained that Chalmers's testimony corroborated the surveillance footage and indicated that Ball Cap and Jones together approached the victim's residence while Chalmers waited in the car.

Black further testified about what witness and co-conspirator Phillip Jones had told him about the plan and conduct of the four alleged robbers, including that Harris (Harris uses the name "Trigger") fired shots. Further, Black testified that Jones identified "Trigger" from photographs, though he did not sign the identification. Text messages taken from co-conspirator Vaughn's phone revealed a message to someone named "Crete Mob Trig" with a screenshot of a news article covering the killing and the message line from Vaughn, "we locked in for life behind this one, big bruh." Transcript, R.116, PageID 372–74. Crete Mob Trig responded, "YKWGO," which Black interpreted as "you know what's going on." Black, searching Vaughn's Facebook friends, found a profile with Trigger in the name, which contained photos of Harris's girlfriend. Call detail records of Trigger's phone number—an 865 number—from AT&T showed Trigger's phone in the area of the crime at the correct time, and searches of law enforcement databases revealed that Harris's girlfriend owned a vehicle of the same make and model that was near the crime scene and captured in the footage. Officers sent to her address found the same vehicle (hidden behind a yard

umbrella that obstructed the view of its license plate from the road). It contained a piece of mail addressed to Harris and several identification documents including a driver's license belonging to "Donald Harris." Officers then sought to arrest Harris and tracked him using phone pings from Trigger's 865 phone number.

After Detective Black's testimony, Harris's probation officer Ian Mills testified about two issues. First, he testified that the phone number he had on file for Harris was the same 865 phone number. Second, he testified that he was familiar with the name "Trigger" from Harris's Facebook page.

During the hearing, Harris's counsel objected to admission of Detective Black's hearsay statements about what the co-conspirators said without an opportunity for cross-examination. The judge stated "the federal rules don't apply in a case like this," to which Harris's counsel replied: "I'm with you as far as the Federal Rules of Evidence not applying. I totally understand that, but the Federal Rules of Procedure do apply." There was some discussion about calling the alleged co-conspirators, but it seemed they were unlikely to testify because they were charged with murder in state court. Harris's counsel objected to the assumption that the co-conspirators would not testify: "I haven't seen any effort, there have been no subpoenas." Nevertheless, the judge found the government had shown good cause not to call the co-conspirators to the stand. Toward the end of the proceeding, the court summarized the significant corroborating evidence in the case.

The district court concluded that the government had shown by a preponderance of the evidence that Harris was involved in the robbery, although it did not conclude who fired the lethal shot. On December 6, 2022, the district court sentenced Harris to 24 months in prison. Harris timely appealed.

4

Harris brings two claims. First, he contends that the district court erred in revoking his supervised release. Second, he believes the court relied on unreliable hearsay and denied him an opportunity to cross-examine witnesses in violation of his rights under Federal Rule of Criminal Procedure 32.1. Neither argument has merit.

## II.

To revoke supervised release, the district court must find by a preponderance of the evidence that a defendant violated the terms of the supervised release. *United States v. Cofield*, 233 F.3d 405, 406 (6th Cir. 2000). "We review a district court's decision to revoke supervised release for abuse of discretion, giving fresh review to its legal conclusions and clear-error review to its fact findings." *United States v. Kontrol*, 554 F.3d 1089, 1091–92 (6th Cir. 2009) (citations omitted).

Harris reviews the evidence on which the district court relied, arguing that the co-conspirators who identified Harris were either "drunk and high" or dishonest. He adds that eyewitness identification testimony is often unreliable. But the co-conspirators' identifications corroborated one another and matched the circumstantial evidence, including the footage capturing a vehicle that was the same make and model as that of Harris's girlfriend, the cell phone data, and the text message from co-defendant Vaughn to Harris's phone stating "we locked in for life behind this one." While it is possible the phone pings could be explained by Harris coincidentally driving near the scene of the crime as the events unfurled, and the identifications might be wrong, it was surely within the discretion of the district court to credit this evidence and find a basis under the preponderance standard for the revocation of supervised release.

Harris also argues that the cellphone data and the use of the 865 phone number were heavily disputed. He contends that officers did not pursue an array of options for identifying the owner of

the 865 number. But Harris had given this number to his probation officer Ian Mills as his contact information. And Harris was linked to "Trigger," who had the same 865 phone number. That is enough to establish by reasonable inference that the phone belonged to Harris. And it is not clear why the cell phone data is unreliable other than the allegation that the accuracy is "disputed." Appellant's Br. at 14. The preponderance-of-the-evidence standard requires a "lesser quantum of proof" than "beyond a reasonable doubt." *United States v. Shakir*, 574 F. App'x 712, 713 (6th Cir. 2014) (quoting *United States v. Thompson*, 314 F. App'x 797, 799 (6th Cir. 2008)).

Next, Harris argues a lack of evidence that he had the requisite intent to commit the offense, as among the possibilities, he may have been joining Cinco de Mayo activities given the crime occurred on May 5, 2020. But the black SUV captured by the camera footage drove by the scene of the crime in advance and stopped at a gas station where the co-conspirators congregated. Then, they headed to the crime scene in the black SUV that matches the vehicle owned by Harris's girlfriend. Trigger's response to Vaughn's message "YKWGO"—"you know what's going on"— suggests some level of knowledge. Given the apparent planning involved and Trigger's message, as well as the deferential standard of review, *United States v. Krug*, 379 F. App'x 473, 477 (6th Cir. 2010), it was not an abuse of discretion for the district court to find by a preponderance of the evidence that Harris had the requisite intent for robbery. The district court fairly used its discretion to revoke Harris's supervised release.

### III.

Harris also believes the district court misapplied the Federal Rules of Criminal Procedure when it did not allow Harris to confront his co-conspirators and relied upon Detective Black's testimony as to what they said. Harris asserts that the court did not perform the required balancing test.

We have previously held that the Sixth Amendment's Confrontation Clause does not apply to revocation-of-supervised-release hearings. *United States v. Kirby*, 418 F.3d 621, 627 (6th Cir. 2005). But "defendants are entitled to minimal due process requirements, including the right to confront and cross examine adverse witnesses." *United States v. Whitely*, 356 F. App'x 839, 843 (6th Cir. 2009) (quoting *United States v. Torrez*, No. 96-1973, 1997 U.S. App. LEXIS 33672, 1997 WL 745520, at *2 (6th Cir. Nov. 24, 1997)). And the Federal Rules of Criminal Procedure establish the right for a person, at a supervised-release-revocation hearing, to "question any adverse witness unless the court determines that the interest of justice does not require the witness to appear." FED. R. CRIM. P. 32.1(b)(2)(C). Generally, the court must weigh the individual's confrontation right "against the government's good cause for denying it." *United States v. Lewis*, 790 F. App'x 702, 706 n.2 (6th Cir. 2019). And so we consider whether the district court properly conducted this analysis.

The district court reviewed the evidence in the case, which came from a variety of sources, and determined that the case was not dependent on the co-conspirators' testimony. And the court reasoned that calling the co-conspirators would be fruitless because they were all facing murder charges in state court and had declined to testify based on their Fifth Amendment rights in those cases. The district court therefore concluded that there was good cause to deny Harris his confrontation right.

However, Harris does not believe that the analysis of the district court was satisfactory in this case. At the supervised release hearing, his attorney said, "I haven't seen any effort, there have been no subpoenas." On appeal, Harris argues, "Here, the adverse witnesses were never served. No attempts were made by the government to subpoena the co-defendants. The government stated that it merely assumed that the co-defendants would not testify . . . ." Appellant's Br. at 30.

7

According to the record, the co-conspirators had spoken with law enforcement officers previously—hence Detective Black, on the stand, repeating back what they said. Given the government's burden in this context, there was no requirement that it present Harris's alleged co-conspirators or seek to procure their appearance. The evidence presented was sufficient to link Harris to the robbery and meet the preponderance of the evidence standard applicable here. It included the video footage, the involvement of a black SUV, the proximity of Trigger's cell phone to the crime at the correct time, significant evidence connecting Harris to the name Trigger, a co-conspirator texting both another co-conspirator and Trigger on the same day saying "we locked in for life," and Trigger responding "YKWGO."

## IV.

The district court did not abuse its discretion when it revoked Harris's supervised release. We therefore AFFIRM.